IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| CHRYSTAL ROBINSON, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | CIVIL ACTION NO. _____-CD |
| vs. | ) | |
| | ) | |
| QUICKEN LOANS, INC., | ) | HON. |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |
| | ) | |

## COMPLAINT

PLAINTIFF, CHRYSTAL ROBINSON, by and through her attorneys, CARLA D. AIKENS, P.C., submit the following Complaint against DEFENDANT QUICKEN LOANS, INC.

## JURY DEMAND

COMES NOW PLAINTFF, CHRYSTAL ROBINSON, and hereby makes her demand for trial by jury.

## JURISDICTION

1. At all times relevant to this complaint, Plaintiff Chrystal Robinson was a resident of Macomb County in the State of Michigan.

2. Defendant is a domestic profit corporation, who conducts continuous and systematic business in Wayne County in the State of Michigan.

3. This action is brought in this Court on the basis of federal question jurisdiction, pursuant to Title VII of the Civil Rights Act of 1964, 42 USC 2000e et seq.

4. Pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over Plaintiffs' state law claims.

1

**VENUE**

5.      Venue is proper in the Eastern District of Michigan pursuant to Section 706(f)(3) of Title VII, 42 U.S.C. § 2000e-5(f)(3), because the unlawful employment discrimination giving rise to Plaintiffs' claims occurred in this District.

**STATEMENT OF FACTS**

6.      On October 20, 2014, Plaintiff was hired by Defendant to be a business analyst by Defendant. Her job was to help organize the individuals on the team to which she was assigned.

7.      Plaintiff is an African-American female.

8.      Plaintiff was successful at her job; Plaintiff received no formal reprimands by her employer and received compensation raises that nearly doubled her initial salary by the time of her termination.

9.      Plaintiff was highly ranked within the company and rewarded several times for her performance and  won numerous awards for getting things done and being the "glue" that held her team together.

10.      Plaintiff's reputation as a reliable employee often led to her being pulled on several "virtual" teams by other leaders and directors within the company. Participating in virtual teams led to more recognition by her peers and leadership team.  Defendant even sent Plaintiff on a vacation to Cancun for a week with other top performers in technology.

11.      In the beginning of 2017, Plaintiff was transferred to a team which had the reputation of being difficult.

12.      The team included highly intelligent individuals with very strong personalities who were often rude and demeaning. The environment was so unwelcoming that Plaintiff's director, Keith

2

Elder, felt the need to take her out to lunch and give her a pep talk about how difficult the team was.

13.     Elder told  her that he believed in her and that if anyone could turn the team around, it would be Plaintiff. He indicated that Plaintiff could give the team some direction and help with their external communication.

14.     Upon further integrating with the new team, called "Web Core," Plaintiff - the youngest person on the team and the sole African-American female -- was disrespected and treated as if she were uneducated and not an equal peer.  Plaintiff's knowledge and education were constantly challenged. It was apparent that the team believed that they were superior to her and that their knowledge succeeded hers.

15.     Plaintiff received no support from leadership to help with this transition.  However, with the pep talk given to her by her previous director, who changed positions shortly after she transfered, Plaintiff was more than willing to take on the challenge.

16.     Plaintiff persisted and eventually was able to show her value to the Web Core team, and she began to work well with the team. After the team leader, Bridget Schiefer, went on maternity leave, Plaintiff and the team began to get along well.

17.     However, prior to Schiefer's departure, and from the moment she began working with the Web Core team, Schiefer had issues with Plaintiff.

18.     At Plaintiff's first meeting with Schiefer, Schiefer told Plaintiff that she did not want her on her team and told Plaintiff's director that Plaintiff was not a good fit.

19.     For approximately the next year, Schiefer continued to make these comments about Plaintiff. She would also give Plaintiff tasks at the last minute and kept Plaintiff out of the loop for various team meetings.

20.     Despite Schiefer's insulting remarks and behavior, Plaintiff remained with the Web Core team.

21.     Approximately a month after Schiefer returned from maternity leave, Plaintiff's new Director, Joe Brach, asked Plaintiff to participate on a crucial virtual team that was changing how the company performed many IT tasks.

22.     Because of Plaintiff's reputation, she was asked to come in and help organize things as well facilitate and drive the meetings to be more effective.

23.     Plaintiff began experiencing issues with sexism on this new team. Plaintiff tried talking to Schiefer about how women were treated differently within the company and that she felt like she was not valued and that her words were not important.

24.     Plaintiff mentioned to Schiefer several examples of how some men were more successful even though they had a similar educational and experiential background as Plaintiff.

25.     Schiefer responded to Plaintiff that those men had "proved their worth," as if to suggest that Plaintiff had not done the same. At this time, Plaintiff had been employed more than four years with the company.

26.     Because Schiefer was  not taking her complaints seriously, Plaintiff spoke with Team Relations Specialists ("TRS") in Defendant's Human Resources department.

27.     Plaintiff informed TRS that a couple of members in her environment, including her director, had been undermining her.

28.     Plaintiff further stated to TRS that she felt like she was not equal to the others on the team and also indicated that she was having issues with Schiefer.

4

29.     Plaintiff believed that Schiefer was attempting to play to racial stereotypes of African-American women being argumentative and confrontational, and trying to convince others that Plaintiff was that way.

30.     Further, Plaintiff was having issues with being respected, as one of the only African-American women in the technology department. She would often be talked over in meetings or had her ideas taken by other white males, who merely repeated comments she had already said in meetings as if Plaintiff had not said them.

31.     In addition, while Plaintiff had enjoyed a good rapport with Brach prior to Schiefer returning from maternity leave, after Schiefer's return, Brach began treating Plaintiff differently and affording her less respect.

32.     As a result of her comments regarding her treatment by Schiefer, TRS requested documentation that Plaintiff had collected on Schiefer over the past year, and Plaintiff e-mailed them the full detailed document. TRS further requested a meeting with Schiefer and Plaintiff.

33.     During the meeting, Schiefer and Plaintiff discussed with TRS how to make things work more smoothly between the two of them.  Plaintiff did not hear amything after this meeting so she assumed that the situation had been rectified.

34.     Less than a month after this meeting, however, Schiefer gave Plaintiff her first and only verbal warning in her entire career with Defendant.

35.     Schiefer stated in the verbal warning that Plaintiff's performance was poor and that she was not working on everthing as she should have.

36.     Plaintiff was confused but had proof that some of the claims were inaccurate. She scheduled a meeting with "Lauren" from TRS who was filling in for "Allie," in hopes of showing

that she was diane the proper work and that her warning would be responded to with factual information.

37.     When Plaintiff spoke with Lauren in TRS, she asked her if the verbal warning would still stand if Plaintiff could prove that some of the claims were inaccurate. Lauren told Plaintiff that it did not matter because Schiefer was the team leader.

38.     Plaintiff informed Lauren that this so-called "company policy"  did not comport with one of the company values- "it's not about who is right, it's about what is right" -- that she was given when she first started with Defendant.  Lauren had this same phrase on a decal in her office.

39.     Plaintiff referenced the decal in Lauren's office and asked how can the company  values be true based on what had just been told to her. Lauren informed Plaintiff that "it's just the way it is."

40.     Plaintiff left the meeting in tears, feeling defeated that there was nothing she could do to salvage her reputation with Defendant.

41.     After the meeting with Lauren, Plaintiff began documenting everything that she did while completing her tasks. Plaintiff updated her tasks so that Schiefer could see what she was doing and what progress she was making.

42.     Upon information and belief, no one else on her team was ever reprimanded nor written up for what Schiefer alleged Plaintiff had done.

43.     Thereafter, it became even more difficult for Plaintiff to have conversations with and engagement with Schiefer.

44.      Plaintiff spoke to "Allie" in Defendant's human resources department about her anxiety and how having these interactions with Schiefer were affecting her health and stress levels.

45.     Plaintiff began seeing a therapist to help her cope with her situation at work, while Schiefer's attitude toward Plaintiff became uncomfortable and noticeable by others.

46.     When Plaintiff asked Schiefer what could be done to salvage the relationship, Schiefer responded that she wanted nothing to do with Plaintiff and would storm out of the room and state that she was done working with Plaintiff. Schiefer even tried to have Plaintiff reassigned from reporting to her to reporting to Joe Brach, Plaintiff's director.

47.     Approximately one month later, Plaintiff was called into an office with Allie from human resources and Joe Brach, her director.

48.     At this meeting, Plaitniff was given an "opportunity letter," which is the equivalent of a write-up.

49.     This opportunity letter was given to Plaintiff despite the fact that she had already received feedback from her team leader and peers that her performance had improved significantly and that her visibility around work was impeccable.

50.     Instead, this "opportunity letter" was given for Plaintiff's presence at work. She was told to take some courses regarding "attitude" and "presence."

51.     Once again, upon information and belief, no one on her team had received an opportunity letter for such alleged conduct.

52.     Plaintiff asked Allie if it were normal to receive a verbal warning for one reason and then a write up for a different reason. Allie informed her that Defendant had "every right to do so."

53.     Not long after this meeting, Brach and Allie had another meeting with Plaintiff regarding an opportunity on another team. Plaintiff was hesitant about taking this position given the skill set she was looking to build, and because she liked working with some of the members of her team and how much progress had been made over the past year.

7

54.     Brach and Schiefer began pressuring Plaintiff to take the position and she knew she had no choice if she wanted to remain employed with Defendant.

55.     Plaintiff took the  new position and soon met with the new team leader, "Rafael." He seemed very supportive and understanding of Plaintiff's situation and her career goals, and he was eager for Plaintiff to get started.

56.     However, after Rafael met with Schiefer to discuss the details of Plaintiff's  transfer, everything changed. Following this meeting, despite the fact that Plaintiff had spoken to him every day for a week, Plaintiff never heard from Rafael again.

57.     On Tuesday, October 16, 2018, Plaintiff met with Brach and Schiefer before her transfer date of Monday, October 22, 2018.  They asked whether she was excited for the move to the new team, and Plaintiff responded that she was ready for a change. They informed Plaintiff at that time that there would be a schedule change with the new position and that the new schedule would be from 9 a.m. to 6 p.m. - an hour longer than her previous position, even though Rafael had told her that the hours would be flexible.

58.     It appeared to Plaintiff that they  believed she would be upset by the time change, but Plaintiff did not say anything and planned to bring it up to Rafael.

59.     Later that week, Plaintiff emailed Rafael to see if she could get her new desk location so that she could move her belongings, but she received no response.

60.     On Friday morning, October 19, 2018, Plaintiff met with members of her former team to say goodbye and to make sure that nothing would be missed when she transitioned to a new team.

61.     Around 11:15 a.m., Plaintiff was interrupted by a cheerful Schiefer to attend an ad hoc meeting. In the room for the meeting was Defendant's senior vice president, Kristina Kolbas.

62.     Kolbas, with whom Plaintiff had rarely interacted, began to recap the events that had occurred over the last few months and abruptly informed Plaintiff that Defendant was terminating her employment. When Plaitniff attempted to ask a question, Kolbas interrupted her and told her that it did not matter and that there was nothing she could do.

63.     Following her termination, Plaintiff filed a charge of discrimination with the Detroit office of the Equal Employment Opportunity Commission ("EEOC") on the basis of her (1) sex/gender, (2) race, and (3) Defendant's retaliation against her.

64.     Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT I
## DISCRIMINATION ON THE BASIS OF RACE IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. 2000e *et seq*. ("Title VII")

65.     Plaintiff incorporates by reference all allegations in the preceding paragraphs.

66.     At all material times, Defendant was an employer and Plaintiff an employee covered by, and within the meaning of, Title VII, as amended.

67.     Defendant's conduct, as alleged herein, violated Title VII of the Civil Rights Act of 1964, which makes it unlawful to harass or discriminate an employee on the basis of that employee's skin color.

68.     A respondeat superior relationship existed because Schiefer had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct Plaintiff's daily work activity, as alleged in the statement of facts.

69.     Plaintiff is an African-American woman, and, as a result, is a member of a protected class, pursuant to Title VII.

70.     Plaintiff was subjected to offensive communication and/or conduct on the basis of their membership in this protected class.

9

71.     Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiffs's rights.

72.     Plaintiff notified Defendant, through its agents, of the unwelcomed conduct and communication and Defendant failed to remedy the unwelcomed conduct or communication.

73.     The unwelcomed conduct or communication was intended to or in fact did substantially interfere with Plaintiff's employment and created an intimidating, hostile, or offensive work environment, as alleged in the statement of facts.

74.     As a proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

75.     As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

76.     Plaintiff requests the relief as described in the Prayer for Relief below.

### COUNT II
### DISCRIMINATION ON THE BASIS OF RACE IN VIOLATION OF THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL 37.2101 et seq. ("ELCRA")

77.     Plaintiff incorporates by reference all allegations in the preceding paragraphs.

78.     At all material times, Defendant was an employer and Plaintiff was an employe covered by, and within the meaning of the ELCRA.

79.     Defendant's conduct, as alleged herein, violated the ELCRA which makes it unlawful to harass or discriminate against an employee because of their race or skin color.

80.     A respondeat superior relationship existed because Schiefer had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of the Plaintiff's daily work activity, as alleged in the statement of facts.

81.     Plaintiff is an African-American woman, and, as a result, is a member of a protected class, pursuant to Title VII.

82.     Plaintiff was subjected to offensive communication and/or conduct on the basis of her membership in this protected class.

83.     The communication and conduct was unwelcomed.

84.     This unwelcomed conduct and communication was intended to or in fact did substantially interfere with Plaintiff's employment or created an intimidating, hostile, or offensive work environment as alleged in the statement of facts.

85.     Plaintiff continually notified and complained to Defendant through its agents of the unwelcomed conduct or communication and Defendant failed to remedy the unwelcomed conduct or communication.

86.     As a direct and proximate result of the Defendant's wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and have suffered mental anguish, emotional distress, humiliation and embarrassment, and loss of professional reputation.

87.     Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT III
## DISCRIMINATION ON THE BASIS OF AGE IN VIOLATION OF THE ELCRA

88.     Plaintiff incorporates by reference all allegations in the preceding paragraphs.

89.     At all material times, Plaintiff was an employee, and Defendant was an employer covered by, and within the meaning of, the ELCRA.

90.     A respondeat superior relationship existed because Schiefer and other agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity, as alleged in the statement of facts.

91.     Defendant's conduct, as alleged herein, violated the ELCRA which makes it unlawful to discriminate against an employee on the basis of their age.

92.     The ELCRA makes it so Plaintiff is a member of a protected class for the purpose of her age.

93.     Plaintiff, like the other younger employees, had more issues that negatively affected her work and/or were fired, disproportionate to Defendant's older workers.

94.     As a direct and proximate result of the Defendant's wrongful acts and omissions, Plaintiff has sustained losses of earnings, earning capacity, and fringe benefits and has suffered mental anguish, emotional distress, humiliation and embarrassment, and loss of professional reputation.

95.     As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

96.     Plaintiff requests relief as described in the Prayer for Relief below.

<u>COUNT IV</u>
**DISCRIMINATION ON THE BASIS OF SEX/GENDER IN VIOLATION OF TITLE VII**

97.     Plaintiff incorporates by reference all allegations in the preceding paragraphs.

98.     At all material times, Defendant was an employer and Plaintiff was an employee covered by, and within the meaning of, Title VII, as amended.

99.     A respondeat superior relationship existed because Schiefer and other agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity, as alleged in the statement of facts.

100.    Defendant's conduct, as alleged herein, violated Title VII, which makes it unlawful to

harass or discriminate an employee on the basis of sex or gender.

101.     Plaintiff is a woman, and, accordingly, is a member of a protected class for the purposes of Title VII.

102.     Plaintiff was subjected to communication and conduct on the basis of her status as a member of this protected class including but not limited to: being constantly undermined and never listened to regarding issues of her complaints, Schiefer's retaliation for Plaintiff speaking up, and the refusal of Defendant to do anything about Plaintiff's complaints.

103.     Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard of Plaintiff's rights.

104.     Plaintiff notified Defendant and its agents of the unwelcomed conduct and communication, however, Defendant failed to remedy the same.

105.     The unwelcomed conduct or communication was intended to or in fact did substantially interfere with Plaintiff's employment and created an intimidating, hostile, and/or offensive work environment, as alleged in the statement of facts.

106.     As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

107.     As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

108.     Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT V
## DISCRIMINATION ON THE BASIS OF SEX/GENDER IN VIOLATION OF THE ELCRA

109.     Plaintiff incorporates by reference all allegations in the preceding paragraphs.

110.     At all material times, Plaintiff was an employee, and Defendant was her employer covered by, and within the meaning of, the ELCRA.

111.     A respondeat superior relationship existed because Schiefer had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity, as alleged in the statement of facts.

112.     Defendant's conduct, as alleged herein, violated the ELCRA, which makes it unlawful to harass or discriminate against an employee because of sex or gender.

113.     Plaintiff is a woman, and, accordingly, is a member of a protected class for the purposes of the ELCRA.

114.     Plaintiff was subjected to communication and conduct on the basis of their status as a member of this protected class including but not limited to: being constantly undermined and never listened to regarding issues of issues of her complaints, Schiefer's retaliation for Plaintiff speaking up, and the refusal of Defendant to do anything about Plaintiff's complaints.

115.     The unwelcomed conduct and communication was intended to and in fact did substantially interfere with Plaintiff's employment and created an intimidating, hostile, and/or offensive work environment as alleged in the statement of facts.

116.     Plaintiff continually notified Defendant and its agents of unwelcomed conduct and communication; however, Defendant failed to remedy the same.

117.     As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

118.     As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

119.     Plaintiff requests relief as described in the Prayer for Relief below.

**COUNT VI**
**RETALIATION IN VIOLATION OF TITLE VII**

120.     Plaintiff incorporates by reference all allegations in the preceding paragraphs.

121.     At all material times, Defendant was an employer and Plaintiff was an employee covered by, and within the meaning of, Title VII, as amended.

122.     A respondeat superior relationship existed because Schiefer and other agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity, as alleged in the statement of facts.

123.     Defendant's conduct, as alleged herein, violated Title VII which makes it unlawful to harass or retaliate against an employee for engaging in protected activity.

124.     Plaintiff engaged in protected activity, as more fully laid out in the statement of facts, including, but not limited to, when they consistently and continually brought to Defendant's attention the specific issues with instances of racism, sexism, and the hostility of the workplace, eventually bringing the issues to HR's attention and writing formal emails.

125.     Defendant, through its agents, had knowledge that Plaintiff engaged in protected behavior because Plaintiffswould consistently give specific knowledge of issues directly to members of HR and/or Schiefer.

126.     After Plaintiff engaged in protected activity, Defendant's agents thereafter harassed Plaintiff and took several adverse employment actions because of that activity, as alleged in the statement of facts and herein, subjecting Plaintiff to severe and pervasive retaliatory harassment by a supervisor, culminating all the way to the termination of Plaintiff.

127.    Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard of Plaintiff's rights.

128.    Plaintiff notified Defendant and its agents of the unwelcomed conduct and communication; however, Defendant failed to remedy the same.

129.    As a proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

130.    As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

131.    Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT VII
## RETALIATION IN VIOLATION OF THE ELCRA

132.    Plaintiff incorporates by reference all allegations in the preceding paragraphs.

133.    At all material times, Plaintiff was an employee, and Defendant was her employer covered by, and within the meaning of, the ELCRA.

134.    A respondeat superior relationship existed because Schiefer and other agents of Defendant had the ability to undertake or recommend tangible decisions affecting all Plaintiffs and the authority to direct all of the Plaintiffs daily work activity, as alleged in the statement of facts.

135.    Defendant's conduct, as alleged herein, violated the ELCRA which makes it unlawful to retaliate against an employee who has engaged in protected activity.

136.    Plaintiff engaged in protected activity, as more fully laid out in the statement of facts, including, but not limited to, when they consistently and continually brought to Defendant's attention the specific issues with instances of racism, sexism, and the hostility of the workplace, eventually bringing the issues to HR's attention and writing formal emails.

137. Defendant, through its agents, had knowledge that Plaintiff engaged in protected behavior because Plaintiff would consistently give specific knowledge of issues directly to members of HR and/or Schiefer.

138. After Plaintiff engaged in protected activity, Defendant's agents thereafter harassed Plaintiff and took several adverse employment actions because of that activity, as alleged in the statement of facts and herein, subjecting Plaintiff to severe and pervasive retaliatory harassment by a supervisor, culminating all the way to the termination of Plaintiff.

139. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard of Plaintiff's rights.

140. Plaintiff notified Defendant's agents of the unwelcomed conduct or communication; however, Defendant failed to remedy the same.

141. As a proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

142. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

143. Plaintiff requests relief as described in the Prayer for Relief below.

**COUNT VIII**
**HOSTILE WORKPLACE ENVIRONMENT IN VIOLATION OF TITLE VII**

144. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

145. At all material times, Defendant was an employer and Plaintiff was an employee covered by, and within the meaning of, Title VII, as amended.

146.     A respondeat superior relationship existed because Schiefer and other agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity, as alleged in the statement of facts.

147.     Defendant's conduct, as alleged herein, violated Title VII which makes it unlawful to create a work environment that a reasonable person would consider intimidating, hostile, or abusive.

148.     Plaintiff's supervisors continued abuse, beginning the day that Schiefer returned from maternity leave until Plaontiff was terminated, was hostile, intimidating, and abusive.

149.     Moreover, Plaintiff's continual attempts to have the situation remedied, coupled with Defendant's ability to accuse Plaintiff of misbehaving made the situation untenable.

150.     The communication and conduct was unwelcomed.

151.     The unwelcomed conduct and communication was intended to, or in fact did, substantially interfere with Plaintiff's  employment, and created an intimidating, hostile. and offensive work environment, as alleged in the statement of facts.

152.     As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

153.     As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

154.     Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT IX
## HOSTILE WORKPLACE ENVIRONMENT IN VIOLATION OF THE ELCRA

155.     Plaintiff incorporates by reference all allegations in the preceding paragraphs.

156.     At all material times, Plaintiff was an employee, and Defendant was her employer covered by, and within the meaning of, the ELCRA.

157.     A respondeat superior relationship existed because Schiefer and other agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity, as alleged in the statement of facts.

158.     Defendant's conduct, as alleged herein, violated the ELCRA which makes it unlawful to create a work environment that a reasonable person would consider intimidating, hostile, or abusive.

159.     Plaintiff's supervisors continued abusive conduct, from the day Schiefer returned from maternity leave until the day Plaintiff was terminated, was hostile and intimidating.

160.     Moreover, Plaintiff's continual attempts to have the situation remedied, coupled with Defendant's ability to accuse Plaintiff of misbehaving, made the situation untenable.

161.     The unwelcomed conduct and communication was intended to, or in fact did, substantially interfere with Plaintiff's employment, and created an intimidating, hostile, or offensive work environment, as alleged in the statement of facts.

162.     As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

163.     As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

164.     Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT X
## WRONGFUL DISCHARGE IN VIOLATION OF MICHIGAN PUBLIC POLICY AS TO DEFENDANT EMPLOYER

165.     Plaintiff incorporates by reference all allegations in the preceding paragraphs.

166.     It is the longstanding public policy of the State of Michigan that there are three exceptions to the employment at-will doctrine, and an employer can be found to be liable for wrongful discharge, where:

1)  Explicit legislative statements prohibiting the discharge, discipline or other adverse treatment of employees who act in accordance with a statutory right or duty;
2)  The alleged reason for the discharge was the failure or refusal of the employee to violate a law in the course or employment; and
3)  The reason for the discharge was the employee's exercise of a right conferred by a well-established legislative enactment.

167.     Plaintiff's discharge came as the result of the fact that she consistently stood up for the rights that were promised to her in different civil rights statutes insisting that Defendant run its establishment in a manner that does not infringe upon the rights of its employees.

168.      These rights are conferred to Plaintiff by well-established legislative enactments, specifically including, but not limited to, Title VII & the ELCRA.

169.     Moreover, Plaintiff's termination came soon after she made Defendant aware that it was infringing upon her civil rights.

170.     Moreover, ELCRA and Title VII have explicit language that prohibit the discharge, discipline, or other adverse treatment of Plaintiff; however, Defendant retaliated against Plaintiff for attempting to protect her rights as laid out in these statutes.

171.      As a result of Defendant's actions, and consequent harms caused, Plaintiff has suffered such damages in an amount to be proven at trial.

172.     Plaintiff requests relief as described in the Prayer for Relief below.

### **RELIEF REQUESTED**

PLAINTIFF, CHRYSTAL ROBINSON, respectfully requests that this Honorable Court enter judgment against Defendant as follows:

1. Compensatory damages in whatever amount to which Plaintiff is entitled;

2. Exemplary damages in whatever amount which Plaintiff is entitled;

3. An award of lost wages and the value of fringe benefits, past and future;

4. An award of interest, costs, and reasonable attorney fees; and

5. An order awarding whatever other equitable relief appears appropriate at the time of final judgment.

Dated:  October 24, 2019

Respectfully Submitted,

/s/ Connor Gallagher
Connor B. Gallagher (P82104)
CARLA D. AIKENS, P.C.
*Attorneys for Plaintiff*
615 Griswold Ste. 709
Detroit, MI 48226
connor@aikenslawfirm.com