UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRYSTAL ROBINSON,

    Plaintiff,        Case No. 19-cv-13129

v.             Honorable Nancy G. Edmunds

QUICKEN LOANS, INC.,

    Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT [17]**

Plaintiff Chrystal Robinson was discharged by Defendant Quicken Loans, Inc., from her job as a business analyst. Shortly thereafter, Plaintiff filed suit in this Court alleging Defendant created a hostile workplace environment and that her discharge amounted to race and gender discrimination, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.[1] Presently before the Court is Defendant's motion for summary judgment. The motion is opposed and fully briefed. (*See* ECF No. 17, 22, 23). Pursuant to L.R. 7.1(f)(2), the Court declines to hold oral argument. For the reasons below, the Court **GRANTS** Defendant's motion.

I. **Background**

Plaintiff Chrystal Robinson is an African American female. She graduated with honors from Warren Mott High School in 2010 and went on to obtain a dual degree in Business Management and Computer Information Systems in 2015. In October of 2014,

---

[1] Plaintiff also brought several state-law claims pursuant to Michigan's Elliot-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101, *et seq.*, and Michigan public policy, but the Court declined to exercise supplemental jurisdiction and those claims were dismissed without prejudice. (ECF No. 3.)

she began her employment with Defendant Quicken Loans as an intern. Quicken Loans designed its internship program to be a stepping-stone into regular placement within the organization. The company therefore encouraged its interns, including Plaintiff, to explore different departments and roles during their internship so they could identify the full-time positions they were interested in joining upon graduation. Consistent with this program, Plaintiff spent her internship working as an executive administrative assistant but was given flexibility to shadow those working in several other roles. She determined the business analyst role "was the one that [she] was being pulled to most" and joined Quicken Loans full time as a business analyst in May of 2015. (*See* ECF No. 17, *Defendant's Motion*, 2; ECF No. 22-1, *Plaintiff's Deposition*, 26:4-15; 27:5-22.)

When Plaintiff first started as a business analyst, she reported directly to the director of the department, Keith Elder. Those in the technology department were frequently moved around, however, and Plaintiff was transferred to a team called Web Core. Members of Web Core answered to Bridget Schiefer, the team leader. Plaintiff was familiar with Schiefer, who is also an African American female, from her time as an intern. The two had never worked together but had previously gotten along very well. Plaintiff testified at her deposition that she and Schiefer shared common ideas and participated in Quicken Loans' women empowerment and fitness group together. It was a "positive relationship." (ECF No. 22-1, *Plaintiff's Deposition*, 52:2, 53:2-13.) According to Schiefer, she and Plaintiff frequently met to discuss women empowerment activities and work. (ECF No. 17, *Defendant's Motion*, 2.) Despite the initial positive relationship, tensions quickly rose between the two once Plaintiff joined Web Core.

Plaintiff testified that Schiefer told her she was opposed to allowing Plaintiff to join her team and reported her displeasure to the director when she found out about Plaintiff's transfer. (ECF No. 22, *Plaintiff's Response*, 2.) The transfer nevertheless went through, and Plaintiff joined Web Core as the team's business analyst in October 2016. Plaintiff states there was immediate tension between herself and Schiefer though she did not know why. (*Id.* at 2-3.) Eventually, both Plaintiff and Schiefer individually reached out to Keith Elder, the director of the department, to discuss the problems that existed between the two. The director sat down with the two women to help them find middle ground and began assigning Plaintiff tasks from virtual teams to lessen her interactions with Schiefer. This worked for a while, and the interactions between the two stopped completely when Schiefer left for maternity leave. (*Id.* at 3.)

According to Plaintiff, the team did very well while Schiefer was gone due in part to Plaintiff's increased responsibility during Schiefer's absence. (ECF No. 22-1, *Plaintiff's Deposition*, 63:5-17.) But when Schiefer returned, Plaintiff alleges she and others perceived her to be "negative and angry" and Plaintiff claims she "got the brunt of things." (*Id.* at 60:25-61:3.) At her deposition, Plaintiff speculated that Schiefer may have felt threatened by Plaintiff's performance during her absence and feared Plaintiff would replace her. When asked how that related to her claims of discrimination, Plaintiff testified as follows:

> Q:  How is that related to your race?
> A:  Because she's a black woman and professional situation, and I am, too. And people often compare each other when you're black. . . . [T]here's often a – there can only be one, type of mentality. . . .
> Q:  Okay. So do you believe that it was related to your sex that she treated you this way?

> A:  No. I don't – no, I don't know. I don't know why. I'm basing
> assumptions. Do I believe it's because of my sex? I could see
> that. I was the only woman on the team, yeah, maybe.
> Q:  She was also a female; correct?
> A:  Yeah. But she also was and very much like me. I'm one of
> those females who participate well in dominantly male
> conversations. So like, there can't be two of us, you know. I'm
> just guessing, right? I'm just being facetious a little bit. . . . I
> think I checked a bunch of boxes she didn't want checked. . .
> . Age, of my race, and my – me being a woman. I do believe
> that in – because I know Bridget is very big on, like, pushing
> women up inside of I.T. So I'm very hesitant to say sex.

(*Id.* at 63:21-65:11.)

Defendant presents an alternative view of this time period through deposition testimony and a sworn statement by Schiefer. She states Plaintiff confided in her that she was unhappy as a business analyst and she hoped to find another career path at Quicken Loans. (ECF No. 17, *Defendant's Motion*, 3.). This unhappiness, Defendant argues, affected Plaintiff's attitude and job performance. She "struggled to make it into the office and work full workdays, her follow-through on projects waned, and she became combative and unreceptive to any type of feedback." (*Id.* at 3.). Consistent with this argument, Defendant attaches Plaintiff's 2017 annual review that notes she "achieves expectations" but suggested she "work on [her] tone and body language." (ECF No. 17-4.)

In early 2018, Schiefer gave Plaintiff a decreased workload so she would have more time to shadow others and explore different positions within the company. Plaintiff, however, never applied or interviewed for any other position within Quicken Loans. (ECF No. 17, *Defendant's Motion*, 4.) Thereafter, Defendant argues, "[Plaintiff's] attendance remained spotty; at times she simply did not show for work without notice [and] [s]ome teammates ceased working with [Plaintiff] because she was unreliable." (ECF No. 17-2,

*Declaration of Bridget Schiefer*, ¶14.) Schiefer documented many of Plaintiff's unexcused absences and late arrivals in Plaintiff's electronic drive. (*See* ECF No. 17-5.)

In May of 2018, Plaintiff was given a verbal warning based upon the substandard quality of her work and her failure to complete assigned tasks. Schiefer followed-up on the warning with an email to Plaintiff that summarized the issues discussed, cited several specific examples of times when Plaintiff failed to meet expectations, and identified actions to be taken and resources available to Plaintiff to assist her with improving her job performance. (*See id.*) According to Defendant, Plaintiff did not agree with the verbal warning and met with her team relations specialist in an attempt to have it removed. She did not allege any discrimination during this meeting. (*See* ECF No. 17, *Defendant's Motion*, 4.)

Shortly thereafter, in Plaintiff's 2018 mid-year review, Schiefer rated Plaintiff as "needs improvement" and encouraged her to "be mindful of [her] tone." (ECF No. 17-6.) Similarly, another Quicken Loans employee wrote "[Plaintiff's] attitude and demeanor [have] improved, but her work output still struggles greatly and the team does not know what they can rely on her for." (*Id.*) On August 31, 2018, Plaintiff was given a second warning, this time in writing and signed by Joe Brach as team leader. This warning emphasized the need for immediate improvement and described several instances since Plaintiff's verbal warning where Plaintiff's performance and behavior had not met expectations. (*See* ECF No. 17-8.)

Schiefer alleges she continued to try to help Plaintiff after she was issued the written warning. (ECF No. 17, *Defendant's Motion*, 5.) Believing that a change of scenery might improve Plaintiff's performance, she endorsed Plaintiff for a transfer to another

team in October of 2018. (*Id*. at 5-6.) On October 16, Schiefer and Joe Brach met with Plaintiff to discuss her transition to the new team. According to Schiefer's notes from that meeting, Brach pointed out to Plaintiff that she had been coming in late and leaving early even though employees were expected to work full eight-hour days. (*See* ECF No. 17-5.) Defendant states "Plaintiff acknowledged the message, left the meeting, went back to her desk for about 10 minutes, and then left early" having only worked approximately seven hours that day. (ECF No. 17, *Defendant's Motion*, 6.) Thereafter, Schiefer recommended termination and Plaintiff's employment was terminated on October 19, 2018.

Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") after her termination and then filed this action on October 24, 2019. Defendant now moves for summary judgment on all remaining claims.

## II.    Standard of Review

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Notably, there is no requirement in Rule 56 that a motion for summary judgment be supported with evidence *negating* an opponent's claim. *Id*. A moving party may meet its burden by showing the absence of evidence necessary to support the nonmoving party's claims. *Id*. at 325.

When the moving party has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*

6

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The party opposing the motion must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). Thus, a factual dispute that "is merely colorable or is not significantly probative" will not defeat a properly supported motion for summary judgment. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993).

When ruling on a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *U.S. SEC v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (quoting *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). If the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact and summary judgment is appropriate. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002).

**III.    Analysis**

**A.    Disparate Treatment Claims**

The disparate treatment provision of Title VII makes it unlawful for an employer  "to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1). An employer becomes liable when the plaintiff "establish[es] that the defendant had a discriminatory intent or motive for taking a job-related action." *Chattman v. Toho Tenax*

*America, Inc.*, 686 F.3d 339, 346 (6th Cir. 2012) (quoting *Ricci v. DeStefano*, 557 U.S. 557 (2009)). Accordingly, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000).

In this case, Plaintiff alleges she was discriminated against because she is African American (Count I) and because she is female (Count IV). In its present motion, Defendant claims there was no discrimination and argues the record contains insufficient evidence to create a genuine issue of material fact. To withstand summary judgment on these claims, Plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence to create an inference of discrimination. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016) (citing *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 n. 5 (6th Cir.2008)).

### 1. Direct Evidence

Plaintiff argues she "presented multiple and numerous actions that show direct evidence of Defendant's sexist and racist intent." (ECF No. 22, *Plaintiff's Response*, 18.) Under Title VII, "direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). It does not require the fact finder to draw any inferences to conclude the challenged employment action was motivated at least in part by prejudice against members of the protected group. *Id.* (citing *Nguyen v. City of Detroit*, 229 F.3d 559, 563 (6th Cir. 2000)

(noting that "a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent")). Where a plaintiff establishes direct evidence of improper motive in a Title VII case, the burden then shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive. *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002).

Plaintiff presents only her own deposition testimony as direct evidence of discrimination. She describes four specific instances and two interpretations of the culture at Quicken Loans that she argues meet this standard. First, she describes speaking to Schiefer regarding her perception that black females in the I.T. department were not taken as seriously as their male counterparts:

> [T]here's this stereotype, right? And it just happens to women in general, but it also happens to women of color, especially of my skin tone, much stronger. So if you say something in a meeting or if you're talking to – it's dominantly males in I.T. Everything that you say as a woman is taken completely different as a male if a man says that same exact thing. . . . it's taken even more differently coming out of my black female mouth. It's taken with sass. It's taken with, my same male counterparts who were way more direct and way more [disrespectful] of the person of a different belief as you.

(ECF No. 22-1 at 67:11-68:5.) Plaintiff went on to testify about Schiefer's response:

> And even when I talked to Bridget about this, she told me that it was . . . not because of my – or no, she didn't say it was because of anything I did. She said that the men that I used in the example have proved themselves. That's literally what she said. They proved themselves.

(ECF No. 22-1, *Plaintiff's Deposition*, 68:6-13.) In a separate incident, Plaintiff describes

how she was accused of "cracking the whip":

> In the virtual team it's my job to get people's project update,
> status update. And when [Chris] responded to me very rudely
> and I addressed it, his response was, oh, [Plaintiff is] cracking
> the whip . . . him making a joke about me asking for clarity is
> sexist . . . Cracking the whip, I mean, that's even a little bit
> racist, right? . . . Joe Brach [then] made it a much larger thing
> . . . he took away any significance of it and diminished it. And
> made everyone just completely dismiss my point and make
> his point even stronger . . . Making those comments that are
> unnecessary, he only did that because I was a woman . . .
> Only. Why else? That happens all the time at Quicken.

(*Id.* at 154:22-156:22.) Plaintiff goes on to describe another occasion where she had a

disagreement with a different member of her team:

> [Tyler] told me, [m]aybe we were raised differently. And when
> I brought that to my leadership, he used those exact words.
> We had a disagreement and he said maybe we were raised
> differently. How were we raised differently? He was never
> taken care of or reprimanded or anything. What about me . . .
> I brought that to [human resources]. I brought that to my
> leadership. Both of them. And it fell on deaf ears. And that is
> what happens to anyone with my skin tone. What else could
> it be? Why do I deserve not to be heard?"

(*Id.* at 78:19-79:1, 79:11-17.) Finally, Plaintiff points to her testimony regarding an

incident where, during a meeting in which she was the only woman, Plaintiff "followed up"

with a colleague who "refused to elaborate on an update." (ECF No. 22 at 19.) According

to Plaintiff, "the entire meeting [then] stopped and was taken aback. Plaintiff's superior, a

white male, did not step in to facilitate the conversation; however, he later asked the exact

same question as Plaintiff and was simply provided an answer." *Id.*

Plaintiff additionally argues that certain aspects of the culture at Quicken Loans

constitute direct evidence of discrimination. She states she "was ordered, sometimes by

individuals who were not her superior, to perform stereotypical tasks such as ordering lunch, picking up lunch, cleaning up after meetings, scheduling meetings, and taking notes" even though these tasks were not part of her job duties. According to Plaintiff, only women were required to perform such tasks. (*Id.* at 18-19.) Finally, she states she felt consistently undermined, disrespected, belittled, and "mansplained" during her term of employment. (*Id.* at 19.)

Contrary to Plaintiff's position, none of these instances compel the conclusion that Schiefer's decision to discharge Plaintiff was motivated by racial or gender animus. Schiefer's statement that the men had "proved themselves" for example, does not lead one to the immediate conclusion that unlawful discrimination led to Plaintiff being removed from her position as a business analyst. Deriving this purported desire from Schiefer's comment requires the inferential step of concluding that because Schiefer held this belief, she would want to have Plaintiff's employment terminated. Similarly, the workplace culture and other specific instances Plaintiff describes would support a finding of racial or gender discrimination only if a factfinder were to infer that Plaintiff's colleagues made their statements or requests because of Plaintiff's race or gender. Moreover, Plaintiff fails to show, or even allege, that these specific instances were a "motivating factor" in her eventual termination. *See Johnson*, 319 F.3d at 865. Plaintiff may have connected these statements to her termination in her own mind, but subjectivity is insufficient as a matter of law to defeat summary judgment. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585-586 (6th Cir. 1992) ("rumors, conclusory allegations and subjective beliefs ... are wholly insufficient evidence to establish a claim of discrimination as a matter of law"). Because Plaintiff fails to establish that Defendant was predisposed to discriminate on the basis of race or gender

and fails to establish Defendant acted on a predisposition, Plaintiff cannot proceed on a direct evidence theory.

### 2. Circumstantial Evidence

In contrast to direct evidence, circumstantial evidence "does not on its face establish discriminatory animus" but permits the factfinder to infer the existence of discriminatory intent. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). Title VII claims supported by circumstantial evidence are examined using the three-part burden-shifting framework developed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case. If he or she can establish a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged action. If the defendant articulates such a reason, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason represents a mere pretext for unlawful discrimination. *See McDonnell Douglas*, 411 U.S. 792, 802-04.

Here, Plaintiff is unable form a *prima facie* case for either her race or gender discrimination claims and therefore cannot progress past the first step of the *McDonnell Douglas* analysis. To establish a *prima facie* case of discrimination, a plaintiff must show (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) she was qualified for her position; and (4) she was replaced by a person outside her protected class or treated differently than similarly situated nonminority employees. *Tennial v. United Parcel Service, Inc.*, 840 F.3d 292, 303 (6th Cir. 2016). Defendant does not dispute Plaintiff meets elements one, two, and three, but

Plaintiff cannot meet element four – she was not replaced by a member outside her protected class nor was she treated differently from similarly situated non-minority employees.[2] (ECF No. 17, *Defendant's Motion*, 8-9.)

To be deemed "similarly-situated," the individual with whom Plaintiff "seeks to compare [her] treatment must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583. Defendant argues Plaintiff has not introduced this evidence. In response, Plaintiff states:

> Here, again, Plaintiff is the only employee in Bridget Schiefer's career who "progressed" in discipline beyond a verbal warning, to the point of termination. Again, this is despite the fact that a member of her team had documented performance issues and was even considered the "black sheep" of the team. Additionally, while Ms. Schiefer did testify she wrote up Matt Culf for his performance issues, no documentation or proofs have ever been provided to Plaintiff to confirm this testimony, despite Plaintiff's request. As a result, it would seem that Plaintiff may have been the only worker on her team to ever get written up at all. Additionally, the contempt that Ms. Schiefer showed for Plaintiff was unprecedented. Not only did she attempt to block Plaintiff from joining her team, but Ms. Schiefer confirmed in an email that she told Plaintiff there was nothing she could ever do to fix the relationship. Finally, Plaintiff was treated differently in how Ms. Schiefer attempted to remove her from the team, and, ultimately was successful with termination.

(ECF No. 22, *Plaintiff's Response*, 16-17.)

From this, it seems Plaintiff is suggesting she was treated differently from others on her team because (1) she is the only employee to have been terminated by Schiefer

---

[2] Schiefer testified that after Plaintiff was terminated from her role as a business analyst, the team shifted the open position to a product owner role and another African American female took Plaintiff's place on the team. (ECF No. 22-2, *Schiefer's Deposition*, 26:15-27:5.)

after receipt of a verbal warning; (2) Schiefer exhibited more contempt for Plaintiff than she had for any previous employee; and (3) Plaintiff may have been the only person ever written up or terminated by Schiefer. Even assuming all of these are true, however, Plaintiff has provided no evidence that others with whom Schiefer dealt were like Plaintiff "in all respects." *See Mitchell*, 964 F.2d at 583. Although Plaintiff compares herself to colleagues from the same team, all of whom presumably work for the same supervisor, she fails to provide evidence that these employees engaged in conduct similar to her own and received a lesser punishment. For example, Defendant presents evidence that Plaintiff arrived late, frequently did not show up for work, and received poor feedback on annual and mid-year reviews. (*See, e.g.,* ECF No. 17-5.) Plaintiff does not dispute these allegations and yet she has not identified a single member of her own team accused of these same misdeeds. She alleges, without explanation, that one colleague was the "black sheep of the team," who "had a lot of problems himself," but fails to expand on this in any meaningful way. (ECF No. 22-1, *Plaintiff's Deposition*, 51:10-14.) Accordingly, Plaintiff cannot form the *prima facie* case necessary to satisfy the first step of the *McDonnell Douglas* analysis and the Court grants Defendant's request for summary judgment on Plaintiff's discrimination claims.

Notably, even if Plaintiff had provided evidence to support a *prima facie* case of discrimination, Defendant has articulated a legitimate, nondiscriminatory reason for terminating Plaintiff, and she has provided no evidence to show Defendant's reasons were pretextual. The record is replete with examples of times when Plaintiff's conduct or the quality of her work did not meet expectations. For example, on January 12 2017, Keith Elder documented a meeting with Plaintiff and Schiefer where items discussed included

Plaintiff's attendance throughout November and December of 2016, Plaintiff's "lack of being 'all in' on her new team," and Plaintiff's "lack of ability to receive feedback." (ECF 17-5.) Later, on February 26, 2018, Schiefer documented that Plaintiff "no call no show[ed]" on February 6 and did not provide notice that she would be starting late until 10:17 a.m. on February 13 even though team members were expected to notify Schiefer by 9:30 a.m. (*Id.*) Plaintiff was given a verbal warning on May 18, 2018, poor feedback on her 2018 mid-year review from both Schiefer and a separate colleague, and a written warning on August 31, 2018 that described how she "consistently struggled with [her] behavior and attitude at work." (*See id*; ECF No. 17-6, 17-8.)

A plaintiff can refute the legitimate, nondiscriminatory reason that a defendant offers to justify an adverse action by showing that the proffered reason: (1) had no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct. *Wexler*, 317 F.3d at 576. Plaintiff's argument that there was never an investigation into her termination does not meet this standard given the facts surrounding Plaintiff's termination and the lack of evidence presented by Plaintiff. The same is true for Plaintiff's assertion, without evidence, that Defendant deviated from its policy by not allowing Plaintiff to question her write-up. Finally, Plaintiff's insinuation that Defendant falsely accused Plaintiff of an "attitude problem" so as to justify her termination is unsupported by the record. (*See* ECF No. 22, *Plaintiff's Response*, 21-23.) Thus, even if Plaintiff were able to make a *prima facie* case, she has not presented enough evidence to create a genuine issue of material fact and summary judgment in favor of Defendant is proper.

### B.    Retaliation Claim

Plaintiff also brings a retaliation claim against Defendant. Title VII prohibits an employer from discriminating against an employee because they have opposed an employer's practice under Title VII. *See* 42 U.S.C. § 2000e-3 ("It shall be an unlawful employment practice for an employer to discriminate against any of his . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . ."). The opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014).

As with a Title VII discrimination claim, a Title VII retaliation claim supported by circumstantial evidence is analyzed using the *McDonnell Douglas* burden-shifting framework and Plaintiff has the initial burden of establishing a *prima facie* case. *Id.* "The elements of a retaliation claim are similar but distinct from those of a discrimination claim." *Id.* To establish a *prima facie* case of retaliation under Title VII, Plaintiff must demonstrate (1) she engaged in protected activity; (2) Defendant had knowledge of her protected activity; (3) Defendant took action that was "materially adverse" to her; and (4) there was a causal connection between the protected activity and the adverse employment action. *Id.* (citing *Jones v. Johanns*, 264 F. App'x 463, 466 (6th Cir. 2007)).

Assuming, *arguendo*, that Plaintiff could satisfy the first three elements stated above, Plaintiff cannot make a *prima facie* case because she has not shown a causal connection between her complaints and her termination.[3] "Title VII retaliation claims must

---

[3] The parties dispute whether Plaintiff engaged in protected activity and therefore come to different conclusions as to whether Plaintiff can meet the first two elements of a *prima facie* case of retaliation. Plaintiff claims she "testified at length about the constant and multiple reports she would make to human resources and her superiors as to the discrimination she was facing because of her sex and race." (ECF

be proved according to traditional principles of but-for causation . . . [t]his requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 360 (2013). Plaintiff argues, without evidence, that she had been meeting with human resources about her complaints "the very week she was finally terminated" and that this "temporal proximity alone" is enough to establish a causal connection under *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008). (*See* ECF No. 22, *Plaintiff's Response*, 14.) In that case, the plaintiff filed a charge of discrimination with the EEOC on October 7, 2004. The EEOC sent a notice of the plaintiff's charge to his employer a week later, on October 14, but the plaintiff's supervisor did not receive it until October 19 – the same day he terminated the plaintiff's employment. Later at his deposition, the supervisor admitted he had seen the plaintiff's EEOC charge just before terminating the plaintiff's employment. *See id.*

Unlike in *Mickey*, here Plaintiff began making complaints to a supervisor about the tension between her and Schiefer approximately two years before her termination. (*See* ECF No. 22-1, *Plaintiff's Deposition*, 55:3-7.) The record also suggests Plaintiff made her first visit to human resources to discuss her verbal warning on May 18, 2018, five months before she was terminated. As the Sixth Circuit held in *Mickey*:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment

No. 22, *Plaintiff's Response*, 13.) Defendant does not dispute that Plaintiff made complaints, but argues Plaintiff never mentioned race or sex discrimination during those complaints so she did not engage in protected activity. (ECF No. 17, *Defendant's Motion*, 19.)

> action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

516 F.3d at 525. Because significant time elapsed from the time Plaintiff first started making her complaints or visiting human resources, Plaintiff is obligated to provide "other evidence of retaliatory conduct" to establish causation. She has provided no such evidence and cannot show her termination was related in any way to retaliatory or otherwise wrongful action by Defendant. *See University of Texas Southwestern Medical*, 570 U.S. at 360. Accordingly, Plaintiff has not created a genuine issue of material fact as to a causal connection and the Court grants summary judgment in favor of Defendant on Plaintiff's claim of retaliation.

### C.    Hostile Workplace Claim

Plaintiff's remaining claim against Defendant concerns the purported hostile work environment Plaintiff was subjected to while employed by Defendant. "Hostile work environment" refers to an unlawful employment practice under Title VII that arises because of "discriminatory intimidation, ridicule, and insult[s]" repeatedly directed at an employee on the basis of a protected characteristic." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 646 (6th Cir. 2015). To establish a hostile work environment claim, Plaintiff must show (1) she is a member of a protected class; (2) she was subjected to unwelcomed harassment; (3) the harassment was based on Plaintiff's protected status; (4) the harassment unreasonably interfered with her work performance by creating an environment that was intimidating, hostile, or offensive; and (5) Defendant is liable. *Lamanna v. Dayton Police Dep't*, 788 F. App'x 1003, 1008-09 (6th Cir. 2019). Essentially, Plaintiff must demonstrate "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the

victim's employment and create an abusive working environment.' " *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB* v. Vinson, 477 U.S. 57, 67 (1986)).

In arguing this claim should be dismissed, Defendant points to Plaintiff's deposition testimony and Plaintiff's mere speculation as to the reasons her colleagues mistreated her. (ECF No. 17*, Defendant's Motion*, 17) (citing ECF No. 17-3, *Plaintiff's Deposition*, 83:12-17) ("Why else, if not my color? Why not – why else – I mean, if that's the case, everyone would have some issues with [human resources], right? . . . Why else, if not who I am and what you see when you look into my face?") Plaintiff's only response to this argument reads:

> Here the analysis above reigns, and Plaintiff has been subjected to extreme and intolerable instances of race and sex discrimination. Plaintiff was made to think she was crazy, and treated like a different class of human, resulting in her having to seek professional mental health treatment – although, unfortunately, she lost the ability to obtain mental health treatment after she lost her insurance following her termination.

(ECF No. 22, *Plaintiff's Response*, 24-25.) The Court has already summarized the comments and activity Plaintiff was subjected to in the workplace that she alleges were related to her race and gender. *See supra* Section III(A). These comments are perhaps unprofessional, but Plaintiff has not established they rise to the level of "harassment" based on her protected status. Moreover, Plaintiff has provided no evidence or argument to show Defendant's liability.

Furthermore, Plaintiff cannot support a claim of hostile work environment based on a cumulative theory. *See Shazor v. Prof'l Transit Mgmt.*, 744 F.3d 948, 958 (6th Cir.2014) ("Title VII does not permit plaintiffs to fall between two stools when their claim

rests on multiple protected grounds."). A plaintiff may bring a hostile-work-environment claim on this theory only under certain circumstances. For example, courts have permitted the claim when a plaintiff alleges multiple hostile-work-environment claims based on different protected classifications (e.g., race plus gender harassment) if one of the plaintiff's independent claims (racial harassment) is sufficient on its own. See *id.* at 958 (concluding that plaintiff presented enough evidence to state a racial-harassment claim, but also permitting plaintiff to proceed on a cumulative theory based on race and sex); *Hafford v. Seidner*, 183 F.3d 506, 514 (6th Cir.1999) (holding that plaintiff presented enough evidence to state a racial-harassment claim, but also remanding for consideration of a cumulative theory based on race and religion). The claim must also meet the "severe or pervasive" threshold outlined in *Harris* and whether the conduct meets that standard is dependent on the totality of the circumstances. *Williams v. General Motors*, 187 F.3d 553, 563–64 (6th Cir. 1999).

This case is not one of those special cases. None of the specific instances described by Plaintiff or the regularly recurring requests that she take notes, clean up after lunch, etc., rise to the level of "severe or pervasive" conduct and these allegations in the aggregate suffer from the same flaw. Plaintiff alleges a few of her colleagues individually made specific comments that she understood to be racist or sexist, but these comments were neither pervasive nor physically threatening and therefore did not create an actionable hostile working environment. This case is unlike *General Motors* in which the court found that the pervasive, extremely offensive comments, physical contact, and threats towards the female plaintiff in a "male-dominated trade[ ]" constitutes conduct that was frequent, severe, threatening, and humiliating. *Id.* at 564. Moreover, these incidents

do not demonstrate that any of her colleagues' behavior was directed towards Plaintiff because she is a woman or an African American. Given the high standard in the Sixth Circuit, the Court finds no genuine issue of material fact as to whether this conduct rose to the level required for liability on a hostile work environment claim.

Finally, Plaintiff suggests in her response that her hostile work environment claim could also be considered a "retaliatory hostile work environment" claim as defined in *Khamati v. Sec'y of Dept. of the Treasury*, 557 F. App'x 434, 443 (6th Cir. 2014). (*See* ECF No. 22, *Plaintiff's Response*, 25.) There, the Sixth Circuit identified a retaliatory hostile work environment claim "as a variety of retaliation." *Id.* To support a *prima facie* case of retaliatory hostile work environment, a plaintiff must show: (1) she engaged in a protected activity; (2) the defendant knew this; (3) the defendant subjected the plaintiff to severe or pervasive retaliatory harassment; and (4) the protected activity is causally connected to the harassment. *Id.*

Plaintiff provides no specific facts or argument to support a *prima facie* case on a retaliatory hostile work environment claim and it is not this Court's place to "search the entire record to find that genuine disputes of material fact exist" *Id.* at 437. "In fact, the federal rules squarely place this burden on the party seeking to prove the existence of the disputed fact, requiring that '[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record.' " *Id.* (citing Fed. R. Civ. P. 56(c)(1)(A)). Moreover, the Court has already concluded Plaintiff has not provided evidence of causation in her retaliation claim. For these reasons, Plaintiff cannot establish a retaliatory hostile work environment claim and summary judgment in favor of Defendant is proper.

## IV.    Conclusion

For the reasons set forth above, Defendant's motion for summary judgment [17]

is **GRANTED** and Plaintiff's remaining claims are hereby dismissed.


SO ORDERED.

s/  Nancy G. Edmunds
Nancy G. Edmunds
United States District Court Judge

Dated: March 23, 2021


I hereby certify that a copy of the foregoing document was served upon counsel of record on March 23, 2021, by electronic and/or ordinary mail.

s/ Lisa Bartlett
Case Manager